**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- x

LOGAN WILLIAMS,                                          :

                     Plaintiff,           :     Civil Action No.:

                            :

        v.                                      :     **COMPLAINT**

                            :

MARATHON CAPITAL OF ILLINOIS, LLC d/b/a       :

MARATHON CAPITAL, LLC, TED BRANDT,            :     **JURY TRIAL DEMANDED**

CHUCK HINCKLEY and PHILIPPE LAVERTU.          :

                            :

                Defendants.           :

-------------------------------------------------------------------- x

Plaintiff Logan Williams ("Ms. Williams" or "Plaintiff"), as and for her Complaint in this action against Defendants Marathon Capital of Illinois, LLC d/b/a Marathon Capital, LLC ("Marathon"), Ted Brandt, Chuck Hinckley and Philippe Lavertu (collectively, "Defendants"), hereby alleges as follows:

## PRELIMINARY STATEMENT

### *"Are you a friend, or a foe."*

1.     This is what Ted Brandt, Chief Executive Officer ("CEO") of Marathon, demanded to know from Ms. Williams after she began complaining about the discriminatory conduct of former Marathon Managing Director, Chuck Hinckley.

2.     Mr. Hinckley had engaged in a variety of discriminatory acts, including, *inter alia*,

- Regularly accusing Ms. Williams of "sound[ing] like [his] wife;"

- Constantly telling Ms. Williams to "shut up" and "be quiet;"

- Constantly screaming and yelling at Ms. Williams;

- Espousing his view that it was a woman's job to take care of a new child and that men who take paternity leave are "pussys;"

- Forcing Ms. Williams to listen to him complain that his wife will no longer have sex with him, and that he therefore has to use sugar daddy sites; and

- Making sexually explicit comments, such as telling Ms. Williams that she was to be given a "rough ride," which is slang for having sexual intercourse without a condom, if she applied for another position.

3.     Mr. Hinckley had also engaged in discriminatory and sexist conduct towards Diana Drysdale, a former Senior Managing Director at Marathon.  Indeed, after he forced her out of the firm, he began spreading unfounded rumors that she had "fucked her way to the top."

4.     Yet, rather than taking any remedial action against Mr. Hinckley – at the very least Ms. Williams should not have been forced to continue to work with him – all Mr. Brandt was concerned about was whether Ms. Williams was a "friend or foe."  Indeed, Mr. Brandt did not care at all about Mr. Hinckley's misconduct – in his words, "I do have sympathy because you work for Chuck and he will drive you crazy, but Chuck has proven his value here, and you don't have any."  Put another way, Mr. Brandt was willing to protect Mr. Hinckley so long as that served Mr. Brandt's financial interests.

5.     Unfortunately, Mr. Brandt's apathy with respect to Mr. Hinkley's misconduct was hardly surprising, as he runs Marathon like a "boys' club."  Indeed, literally every single member of Marathon's leadership team is a man, and only one out of the firm's 11 Managing Directors are women.  Overall, Marathon employs only five women out of its 43 employees.

6.     Perhaps even more telling, when Ms. Williams told Mr. Brandt that she was not going to join Marathon's women's initiative, he remarked that she had "more brain cells than all of the rest of them put together."  Plainly, Mr. Brandt is a misogynist.

7.     Following Mr. Brandt's lead, many other senior leaders at Marathon also engaged in misogynistic behavior:

2

- Mr. Brandt asked Ms. Williams to invite her model friends to the firm's Christmas party;

- **Mr. Brandt told Ms. Williams that she had "more brain cells than all of the rest of them put together" when she advised him that she was not joining the women's initiative;**

- **Managing Director Barry Gold insinuated to Ms. Williams that she needed to be "more lady like;"**

- Ms. Williams was inappropriately ogled by a supervisor at Marathon who just stared at her breasts during conversations;

- Ms. Williams was disparagingly referred to as a "girl like you" (*i.e.*, "oh, even a girl like you…") by Terry Grant, Managing Partner and co-head of Marathon's west coast office; and

- Ms. Williams was referred to as "little missy" by a Director at Marathon.

8.    As noted above, Mr. Brandt ultimately chose to look the other way and ignore Ms. Williams' complaints about her work environment.

9.    On July 13, 2020, Ms. Williams wrote to, *inter alia*, Mr. Brandt and Mr. Lavertu, and informed them that she was uncomfortable working with Mr. Hinckley in the office:

just to let the three of you know I'm going to be working from home as much as possible while I'm sitting in on the training and although Chuck will physically be in the New York office, I won't and I won't feel pressured to go into the office.

Chuck prefers that I sit in his office with him and when I try to leave to have my own space on the other side of the office he follows me and works next to me. It distracts me from my work and honestly at this point I feel like I've earned the right to my own space.

They are also predicting a second wave of COVID-19 which I feel like I should prepare for, and I can honestly say that I get just as much work done for my house, if not more. so if anyone has a problem with that just let me know.

10.    Again, nothing was done to ensure that Ms. Williams was kept physically apart from Mr. Hinckley.

11.     Only 10 days later, on July 23, 2020, Ms. Williams walked into the conference room in the New York office and found Mr. Hinkley masturbating at his computer.  Mr. Hinckley, who had a look of shock on his face, began to desperately attempt to push his penis back into his pants with his left hand.  He was simultaneously moving his computer mouse with his right hand, apparently in an effort to close whatever was open (probably pornography) on his screen.  Ms. Williams left the room immediately, mortified.

12.     Over the ensuing weeks, as Marathon "investigated" the masturbation incident, Ms. Williams continued to make protected complaints, including in an August 22, 2020 text message in which Ms. Williams questioned possible financial improprieties and stated, *inter alia*, "you are bank rolling a hotel for the bankers to bring young prostitutes, and your friends [Mr. Hinckley] are masturbating in front of me."

13.     Two days later, Ms. Williams was terminated in retaliation for her complaints.

14.     Accordingly, Plaintiff seeks declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices in violation of the New York State Human Rights Law, N.Y. Executive Law §§ 290, *et seq.* ("NYSHRL") and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101, *et seq.* ("NYCHRL").

## JURISDICTION AND VENUE

15.     The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332, as (i) there is diversity of citizenship between Plaintiff, a resident of the State of New York, and Defendants, residents of the States of Illinois and Connecticut, and (ii) this action involves a matter in controversy that exceeds the sum of $75,000, exclusive of interest and costs.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the events or omissions giving rise to this action occurred in this district.

## ADMINISTRATIVE PROCEDURES

17.      Following the commencement of this action, a copy of this Complaint will be served on both the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

18.      Defendants' conduct also violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII").  In connection with these violations, Ms. Williams will file a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and, following receipt of a Notice of Right to Sue from the EEOC, will seek leave to file an Amended Complaint to add claims under Title VII.

19.      Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

20.      Plaintiff Logan Williams is a resident of the State of New York and, at all relevant times, met the definition of an employee of Defendants under all applicable statutes.

21.      Defendant Marathon Capital of Illinois, LLC d/b/a Marathon Capital, LLC is a Delaware limited liability company headquartered in the State of Illinois.  At all relevant times, Marathon met the definition of an employer under all applicable statutes.

22.      Defendant Ted Brandt is the Principal, Founder and CEO of Marathon and a resident of the State of Illinois.  At all relevant times, Mr. Brandt met the definition of an employer and/or aider and abettor under all applicable statutes.

23.      Defendant Chuck Hinckley is a former Managing Director at Marathon and a resident of the State of Connecticut.  At all relevant times, Mr. Hinckley met the definition of an employer and/or aider and abettor under all applicable statutes.

5

24.     Defendant Philippe Lavertu is the Chief Operating Officer of Marathon and a resident of the State of Illinois.  At all relevant times, Mr. Lavertu met the definition of an employer and/or aider and abettor under all applicable statutes.

## FACTUAL ALLEGATIONS

I.     **PLAINTIFF LOGAN WILLIAMS**

25.     Ms. Williams was born and raised in a small town in North Carolina.

26.     Against the odds, Ms. Williams overcame childhood financial instability and the early loss of her parents.

27.     In November 2011, following her graduation from high school, Ms. Williams joined the United States Coast Guard ("USCG").  Ms. Williams served her country in the USCG for five-and-a-half years, first as a Technician in Marine Infrastructure and later as the Executive Assistant to the Captain of the Port of New York.  Ms. Williams was honorably discharged from the USCG.

28.     At the encouragement and with the recommendation of the Captain, Commander of USCG, Sector New York, Ms. Williams began applying for admission to various colleges and was ultimately admitted to Columbia University.

29.     At Columbia, Ms. Williams studied political science.  She graduated – the first in her family to do so from a four-year college – in 2019 with a Bachelor of Arts in Political Science.

30.     While at Columbia, Ms. Williams developed an interest in finance, energy, infrastructure and technology.  She also helped to commence the largest student investment fund on campus, Praetorian Management.  Ms. Williams developed the fund's thesis and design, managed weekly analyst stock pitches, identified target investors and sponsors and grew and

maintained investor relationships through systematic outreach, monthly newsletters and business development initiatives.  The fund was founded and led by women.

## II.   <u>DEFENDANT CHUCK HINCKLEY</u>

31.     Mr. Hinckley was brought into Marathon in 2018 after Marathon acquired American Wind Capital Company, LLC ("AWCC"), a company founded by Mr. Hinckley.  Mr. Hinkley was brought into Marathon as a Managing Director and thereafter promoted to co-head of the New York office (likely something that had been arranged in advance).  Upon information and belief, at that time Mr. Hinckley was given an equity and/or profits interest in Marathon.  At the time Mr. Hinckley met Ms. Williams, he held this position of power at Marathon.



Chuck Hinckley
MANAGING DIRECTOR AND CO-
HEAD OF NYC OFFICE

32.     Ms. Williams met Mr. Hinkley in March 2019, during her senior year at Columbia.  As soon as Mr. Hinckley learned that Ms. Williams was interested in finance, he began to try to convince her to join Marathon.  By their second meeting, Mr. Hinckley told Ms. Williams that he could hire her at Marathon and serve as her mentor.  By their third meeting, Mr. Hinckley was reviewing Ms. Williams' pitch deck for a project related to her work with Praetorian Management.  Their fourth meeting was in Marathon's offices, where Mr. Hinckley offered his support and advice relating to the pitch deck and the solicitation of investors with respect to a particular Praetorian Management investment opportunity.

33.     At the time, Ms. Williams was also considering joining JP Morgan's veteran associate rotational program, but Mr. Hinckley was relentless in his pursuit.  Mr. Hinckley

presented himself as a trustworthy mentor who wanted to help Ms. Williams, and Ms. Williams eventually agreed to work for Mr. Hinckley at Marathon.

## III.   MARATHON CAPITAL, LLC

34.     Marathon – which was founded by Mr. Brandt in 1999 – describes itself as an investment bank focused on the global power and infrastructure markets.  Its stated mission is to provide deep expertise, scale, experience and talent to help maximize its clients' strategic and financial objectives.

35.     In the last year alone, Marathon has advised with respect to significant transactions involving some of the biggest players in the energy space.  Such transactions include, but are by no means limited to:

- The sale of the High Desert Solar Project on behalf of Middle River Power, the operating and development platform of Avenue Capital, to Goldman Sachs Renewable Power;

- Hyliion Inc.'s merger with Tortoise Acquisition Corp.

- The acquisition of Hecate Energy LLC's Aktina Solar Project by Tokyo Gas Co., Ltd;

- The financing of the Summit Wind Project owned by Altamont Winds LLC *via* a tax equity commitment provided by GE Energy Financial Services, as well as term debt commitments and construction debt financing provided by Rabobank and NordLB;

- A tax equity investment provided by Citi to TransAlta Corporation;

- A multi-year funding facility provided by Deutsche Bank to Future Energy Solutions Lighting Group, LLP; and

- The sale of OCI Solar Power LLC's 66 MWDC in-construction solar photovoltaic project to D. E. Shaw Renewable Investments.

36.     Marathon's work and stellar reputation has led to multiple awards.  By way of example, just earlier this month Marathon was named M&A Adviser of the Year in Power Finance & Risk's *17th Annual Deals and Firms of the Year Awards*.

## IV.     MARATHON'S LEADERSHIP – MEN ONLY

37.     Contrary to Marathon's carefully cultivated public image, the reality is that the firm is run as a "boys' club" where women are demeaned, marginalized, underpaid, under titled and subjected to egregious sexually inappropriate comments and conduct.  Unfortunately, Ms. Williams learned this almost as soon as so walked through the door.

38.     When she agreed to join Marathon, Mr. Hinckley asked Ms. Williams to draft specific responsibilities for a new business development role, in which she would work directly for the Managing Directors and co-heads of Marathon's New York office (Mr. Hinckley and Gary Greenblatt).  Much to Ms. Williams' dismay, as she began to draft and negotiate the responsibilities of her position, at the direction of Marathon's Chicago office leadership, including Mr. Brandt, the role morphed into an administrative position on paper, with lower pay than most entry-level employees right out of college.

39.     It is unfortunately unsurprising that the firm's leadership pushed Ms. Williams – a woman – into an administrative role.  Indeed, from the top down Marathon is run and controlled by men.  All nine of the members of Marathon's Senior Leadership Team are men:



**Ted Brandt**
CHIEF EXECUTIVE
OFFICER



**Terry Grant**
MANAGING PARTNER &
CO-HEAD OF WEST COAST
OFFICE



**Philippe Lavertu**
CHIEF OPERATING
OFFICER



**Sean Farnan**
CHIEF FINANCIAL OFFICER



**Bob Braasch**
CHIEF COMPLIANCE
OFFICER & SECRETARY



**Ammad Faisal, CFA**
SENIOR MANAGING
DIRECTOR & CO-HEAD OF
CHICAGO OFFICE



**Gary Greenblatt**
SENIOR MANAGING
DIRECTOR AND CO-HEAD
OF NYC OFFICE



**David Kirkpatrick**
MANAGING DIRECTOR &
CO-HEAD OF WEST COAST
OFFICE



**Ari Pribadi**
SENIOR MANAGING
DIRECTOR & CO-HEAD OF
CHICAGO OFFICE

Source:          https://www.marathoncapital.com/clean-energy-advisors.

40.     Only one of Marathon's 11 Managing Directors is a woman – and, it bears noting that the sole woman works from home in Portland, Oregon, and has very little direct interaction with her peers and firm leadership:


**Gary Greenblatt**
SENIOR MANAGING DIRECTOR AND CO-HEAD OF NYC OFFICE


**Joan Hutchinson**
MANAGING DIRECTOR, OFFTAKE ADVISORY


**Jeremy Hux**
SENIOR MANAGING DIRECTOR, HEAD OF ENERGY AND SUSTAINABLE TECHNOLOGIES


**David Kirkpatrick**
MANAGING DIRECTOR & CO-HEAD OF WEST COAST OFFICE


**Geoff Paul**
MANAGING DIRECTOR, HEAD OF EQUITY CAPITAL MARKETS


**Ari Pribadi**
SENIOR MANAGING DIRECTOR & CO-HEAD OF CHICAGO OFFICE


**Jorge Rodriguez**
MANAGING DIRECTOR, HEAD OF DEBT CAPITAL MARKETS


**Matt Shanahan**
MANAGING DIRECTOR


**Thiago Alfaia**
MANAGING DIRECTOR


**Ammad Faisal, CFA**
SENIOR MANAGING DIRECTOR & CO-HEAD OF CHICAGO OFFICE


**Bob Simmons**
SENIOR MANAGING DIRECTOR

Source:          https://www.marathoncapital.com/clean-energy-advisors.

41.   Only five of Marathon's 43 investment professionals are women:



**Ted Brandt**
CHIEF EXECUTIVE OFFICER



**Terry Grant**
MANAGING PARTNER & CO-HEAD OF WEST COAST OFFICE



**Thiago Alfaia**
MANAGING DIRECTOR



**Ammad Faisal, CFA**
SENIOR MANAGING DIRECTOR & CO-HEAD OF CHICAGO OFFICE



**Gary Greenblatt**
SENIOR MANAGING DIRECTOR AND CO-HEAD OF NYC OFFICE



**Joan Hutchinson**
MANAGING DIRECTOR, OFFTAKE ADVISORY



**Jeremy Hux**
SENIOR MANAGING DIRECTOR, HEAD OF ENERGY AND SUSTAINABLE TECHNOLOGIES



**David Kirkpatrick**
MANAGING DIRECTOR & CO-HEAD OF WEST COAST OFFICE



**Geoff Paul**
MANAGING DIRECTOR, HEAD OF EQUITY CAPITAL MARKETS



**Ari Pribadi**
SENIOR MANAGING DIRECTOR & CO-HEAD OF CHICAGO OFFICE



**Jorge Rodriguez**
MANAGING DIRECTOR, HEAD OF DEBT CAPITAL MARKETS



**Matt Shanahan**
MANAGING DIRECTOR



**Bob Simmons**
SENIOR MANAGING DIRECTOR



**Greg Andiorio**
DIRECTOR, TAX & STRUCTURING



**Felipe Arrazola**
DIRECTOR



**Philip Bassil**
DIRECTOR & COUNTRY MANAGER - CANADA



**Matt Bigham**
DIRECTOR



**Josh Cornfeld**
DIRECTOR



**Leonardo Hernandez**
DIRECTOR



**David Marks**
SENIOR ADVISOR



**John Stephens**
SENIOR ADVISOR



**Hideki Chida**
VICE PRESIDENT



**Mark McDonald**
VICE PRESIDENT



**Sarah Nash**
VICE PRESIDENT, STRATEGY



**Pat Van Grinsven**
VICE PRESIDENT



**Trevor Winnie**
VICE PRESIDENT



**Jen Zhao**
VICE PRESIDENT



**Christopher Bowman**
ASSOCIATE



**Patrick Brandt**
ASSOCIATE



**Petar Dudukovski**
ASSOCIATE



**Eric Fitzgerald**
ASSOCIATE



**Ígor Garcia**
ASSOCIATE



Source:        https://www.marathoncapital.com/clean-energy-advisors.

## V.      DISCRIMINATORY AND MISOGYNISTIC CULTURE

42.      Although Ms. Williams was disappointed with the position she ultimately was

offered, Mr. Hinckley strongly encouraged her to accept the role and assured Ms. Williams that it

would be a great opportunity and that she would be professionally developed.  Notwithstanding

her disappointment, Ms. Williams was swayed by Mr. Hinckley and agreed to take on the role.

She officially joined Marathon in July 9th of 2019.

43.      Ms. Williams excelled in her role, and rather than simply serving an

administrative function, Ms. Williams was ultimately asked to perform many of the core

functions of Mr. Hinckley's job.  Indeed, as correctly put in a text message by Elizabeth Rogers,

Marathon's Director of Training & Talent Development, "[i]t's pretty clear that you've been

doing more and different work than an office coordinator."

44.     Ms. Williams' responsibilities and accomplishments – which she achieved by

regularly working 12 to 16 hour days and weekends – during her short tenure at Marathon

included, but were not limited to:

- Preparation of pitch and presentation materials;
- Building and organizing a deal pipeline for the New York team;
- Staffed on internal business development initiatives, including Marathon's Gas Generation Initiative;
- Passing her FINRA SIE Exam;
- Participating in the IB Summer Analyst training;
- Functioning as the business manager for the New York team;
- Market Research;
- Assisting managing directors with a variety of business development related requests;
- Attend renewable energy conferences and client facing meetings;
- Supporting execution and follow-up efforts on various projects; and
- Report building and analysis of deal data

45.     Ms. Williams' success was all the more remarkable given the environment in

which she was forced to work.

46.     Very shortly after Ms. Williams joined Marathon, she observed two high-level

women – Ally Erskine and Ms. Drysdale – discriminated against and pushed out of the firm.

47.     Ms. Erskine, who worked out of the Chicago office, was the subject of extreme

discriminatory bullying at the hands of Marathon's leadership.  She complained and was fired

the very same day.  Upon information and belief, Ms. Erskine was forced to sign a non-

disclosure agreement that prohibits her from speaking about her experiences at Marathon.

48.     Ms. Drysdale, who was hired as a Senior Managing Director in February 2019, was subjected to a campaign of discriminatory treatment[1] by Mr. Hinckley and was terminated in January 2020.  Immediately following Ms. Drysdale's termination, Mr. Hinckley invited a young man from Ms. Drysdale's pre-Marathon employer, PSEG, to Marathon's offices for a meeting, which Ms. Williams was asked to attend.  During this meeting, Mr. Hinckley accused Ms. Drysdale – without any basis whatsoever – of "fucking her way to the top."

49.     Ms. Drysdale was not the only woman who Mr. Hinkley accused of sleeping her way to the top without any basis for the allegation.  Mr. Hinckley, of course, would never have accused a man of doing the same.  Following Ms. Drysdale's termination, Ms. Williams was the only woman working in Marathon's New York office.

50.     Mr. Hinckley's bother, Andrew Hinkley (pictured below), who serves as a Director at AWCC (owned by Marathon), also accused various women of having achieved professional success only due to their purported willingness to sleep with powerful men.

51.     Andrew Hinckley, who is in his 50s, also repeatedly and inappropriately asked Ms. Williams, who is in her 20s to "set [him] up" with friends of hers that he found attractive.



---

[1]     This treatment included Mr. Hinckley making various jokes about suicide in Ms. Drysdale's presence despite his knowledge that her son had committed suicide in 2016.

52.     Before long, Ms. Williams became a victim of Mr. Hinckley's misogynistic and predatory behavior.  This behavior included, but was not limited to:

- Regularly accusing Ms. Williams of "sound[ing] like [his] wife;"

- Constantly telling Ms. Williams to "shut up" and "be quiet;"

- Constantly screaming and yelling at Ms. Williams;

- Espousing his view that it was a woman's job to take care of a new child and that men who take paternity leave are "pussys;"

- Forcing Ms. Williams to listen to him complain that his wife will no longer have sex with him, which is why he has to use sugar daddy sites;[2] and

- Making sexually explicit comments, such as telling Ms. Williams that she was to be given a "rough ride," which is slang for having sexual intercourse without a condom, if she applied for another position.

53.     In addition to the foregoing, Mr. Hinckley regularly took credit for Ms. Williams' work and deflected blame to Ms. Williams for his mistakes.

54.     There was no escape from Mr. Hinkley for Ms. Williams.  He literally forced her to share an office with him, and when Ms. Williams attempted to work somewhere else in the office, he would follow her around.

55.     During her employment Ms. Williams was also subjected to misogynistic comments and conduct by other male leaders at Marathon.  Such conduct included, but was not limited to:

- Mr. Brandt routinely objectified women, including referring to various professional contacts as "beautiful women;"

---

[2]     Although he lives in Connecticut, Marathon pays for Mr. Hinckley to live out of a hotel during the week in New York City.  Upon information and belief, Mr. Hinckley uses this hotel to entertain prostitutes.

- Mr. Brandt asked Ms. Williams to invite her model friends to the firm's Christmas party;

- Mr. Brandt told Ms. Williams that she had "more brain cells than all of the rest of them put together" when she advised him that she was not joining the women's initiative;

- Mr. Gold insinuated to Ms. Williams that she needed to be "more lady like;"

- Ms. Williams was inappropriately ogled by one of her supervisors, who just stared at her breasts during conversations;

- Ms. Williams was disparagingly referred to as a "girl like you" (*i.e.*, "oh, even a girl like you…") by Mr. Grant; and

- Ms. Williams was referred to as "little missy" by a Director at Marathon.

56.    The conduct to which Ms. Williams was subjected was so hostile and anxiety-inducing that she began to suffer from extremely painful stress-induced stomach ulcers for which she received significant medical treatment.  She was also prescribed anti-anxiety medication to help her handle the stress of the Marathon working environment.

## VI.    MS. WILLIAMS ENGAGES IN PROTECTED ACTIVITY

57.    Ms. Williams was understandably fearful of Mr. Hinckley and, at the same time, continued to be reliant on him for her job.  As Ms. Williams put it in a May 2020 text to Ms. Rogers, "[t]he job market sucks and I need the money right now."  As such, intent on remaining employed, Ms. Williams did the best she could to remain cordial with Mr. Hinckley in her communications with him.

58.    However, Ms. Williams was telling anyone else who would listen about the discriminatory treatment to which she was being subjected and her inability to continue to work

with Mr. Hinckley.[3]  Ms. Williams complained to, *inter alia*, Mr. Brandt, Mr. Lavertu, Ms. Rogers, Andrea Rosko, the Vice President of Marketing, Geoff Paul, Managing Director and Head of Capital Equity Markets and Jorge Rodriguez, Managing Director and Head of Debt Capital Markets.

59.     On July 3, 2020, following complaints to others, Mr. Brandt asked Ms. Williams to call him.  She did so.  Outrageously, Mr. Brandt told Ms. Williams that she should leave the company given how difficult it was for her to work with Mr. Hinckley.  He further stated, "I do have sympathy because you work for Chuck and he will drive you crazy, but Chuck has proven his value here, and you don't have any."  Mr. Brandt also advised Ms. Williams that she would not be permitted to participate in Marathon's Summer Analyst Program, even though the promise of her participation in the program was a major reason that Ms. Williams agreed to join Marathon in the first place.  In accordance with Mr. Brandt's directive that she leave the firm, Ms. Williams sought his help in finding other jobs, but he failed to assist in any meaningful way.

60.     Then, on July 5, 2020, Ms. Williams sent a text message to Mr. Brandt that included, *inter alia*:

---

[3]     Incredibly, there is no Human Resources personnel at Marathon.

I've thought a lot about it and I truly think that investment banking is the best place for me right now. It is where I want to be.

I spent the last year here in the New York office busting my ass for lack of a better word and putting up with Chucks shit. I'm working 12+ hour days on a regular basis and weekends. I think that I, more than anyone here in the junior ranks at marathon, have earned the right to learn how to be an investment banker. I want a fair shot. I realize that I might not be a traditional applicant but I have a degree from an Ivy League school & five years of military experience. I helped start one of the largest asset management funds at Columbia and I have one year of experience a Marathon working at an investment bank. I think that's plenty of experience to do an analyst program. I've probably had much more exposure to finance and renewable energy than the average person with a summer analyst internship. I'm confused as to why anyone would doubt that I am capable.

. . .

I do not think that I am above working my way up, or putting time in, so I've tolerated the current situation, but Chuck's behavior has been very difficult for me to deal with it's caused a huge amount of stress. I don't think that it's fair that I lose an opportunity that I've worked for and that I've earned because of Chucks poor leadership.

I am really unhappy right now and I'm trying to figure out a way to look out for myself and to stay on good terms with Chuck.

61.    The very next day, Mr. Brandt reiterated that Ms. Williams had no future at

Marathon:

Logan, I checked with Philippe. He's going to work with you on your transition and getting your next position but you will not be participating in the Marathon summer internship program. I'll call later today on your resume.

62. Contrary to his promise to find Ms. Williams other employment, Mr. Brandt, again, provided no meaningful help.

63. More importantly, despite being on notice of Mr. Hinckley's wildly inappropriate treatment of Ms. Williams and other women at Marathon, neither Mr. Brandt nor anyone else at the firm took any steps to ensure that Ms. Williams would no longer have to work or be physically present with Mr. Hinckley. During the COVID-19 pandemic, Mr. Hinckley told Ms. Williams that "people who work from home get fired."

64. For her part, Ms. Williams made clear that she did not want to be with Mr. Hinckley.  In a July 13, 2020, text message to Mr. Brandt, Mr. Lavertu and Ms. Rogers, Ms. Williams wrote:



just to let the three of you know I'm going to be working from home as much as possible while I'm sitting in on the training and although Chuck will physically be in the New York office, I won't and I won't feel pressured to go into the office.

Chuck prefers that I sit in his office with him and when I try to leave to have my own space on the other side of the office he follows me and works next to me. It distracts me from my work and honestly at this point I feel like I've earned the right to my own space.

They are also predicting a second wave of COVID-19 which I feel like I should prepare for, and I can honestly say that I get just as much work done for my house, if not more. so if anyone has a problem with that just let me know.

65. Still, neither Mr. Brandt nor anyone else at the firm took any steps to ensure that Ms. Williams would no longer have to work or be physically present with Mr. Hinckley.

66. Ms. Williams was not alone in thinking that the workplace environment at Marathon was discriminatory and misogynistic.  The below is a photograph of a July 17, 2020, text message conversation between Ms. Williams and Ms. Rogers:



67.     One day after this text string, as Ms. Williams continued to complain, Mr. Brandt,

in Trumpesque fashion, began to pressure Ms. Williams to identify whether she was a "friend or

foe."  Attempting to head off any further retaliation, Ms. Williams explained in a text, *inter alia*:



68.     Mr. Brandt failed to respond and did not even deny that he had demanded to know

whether Ms. Williams was a "friend or foe."

69.     Then, on July 22, 2020, during a conversation in which Mr. Lavertu was

attempting to pressure Ms. Williams to discuss her forced transition out of the firm with a newly

hired third-party Human Resources consultant, Ms. Williams made further complaints to Mr.

Lavertu, including, *inter alia*:



The only HR issue I see here is Chuck

i'm not speaking with Katie, sorry

i'm happy to work something out but at this point if I have to deal with HR then I'm going to take other measures as well

and I really do not want to have to do that

Ted is in business with a shady man

and I don't understand why because I would certainly hope that Ted's values are different than Chuck's

Chuck is going to get you guys into a lot of trouble

I wouldn't keep doing business with him if I were Ted

## VII.    MR. HINCKLEY MASTURBATES IN THE CONFERENCE ROOM

70.    Despite all of the foregoing, Marathon still did nothing to ensure that Ms. Williams was, at the very least, kept physically separate from Mr. Hinckley.

71.    On July 23, 2020, Ms. Williams went to the New York office.  When she walked into the conference room – which Mr. Hinkley had taken over as his own office – she found Mr. Hinkley masturbating.

72.    Specifically, Ms. Williams walked in and observed an extremely surprised look on Mr. Hinkley's face.  She looked down and saw Mr. Hinkley desperately trying to push his penis back into his pants with his left hand.  He was simultaneously moving his computer mouse with his right hand, apparently in an effort to close whatever was open (probably pornography) on his screen.

73.    Ms. Williams was mortified and quickly escaped the room.  A short time after, Mr. Hinckley called out to Ms. Williams and – acting like nothing had happened – insisted that she sit down with him to discuss work matters with her for over an hour.

74.    Ms. Williams immediately texted multiple people about the incident.

75.     Ms. Williams texted Mr. Rodriguez the following:



76.     Mr. Rodriguez is a Managing Director and the Head of Debt Capital Markets at Marathon.  Yet, upon information and belief, he did not report this incident to anyone.

77.     Ms. Williams also texted Mr. Paul:



78.     Mr. Paul is a Managing Director and the Head of Capital Equity Markets at Marathon.  Yet, upon information and belief, he did not report this incident to anyone

79.     Ms. Williams also texted Ms. Rogers:



80.     The following day, July 24, 2020, Ms. Williams formally reported the masturbation incident to Mr. Lavertu.

## VIII.   MARATHON ATTEMPTS TO SILENCE MS. WILLIAMS

81.     Shortly after she reported the masturbation incident, on an apparent ongoing effort to protect Mr. Hinckley, Ms. Williams was directed by Mr. Lavertu not to discuss the masturbation incident with anyone.  Demanding that an employee not discuss sexual harassment in the workplace is, of course, illegal and in violation of the anti-discrimination laws as well as the National Labor Relations Act.

82.     On approximately July 25, 2020, Ms. Williams received a call from David Bruno.  Mr. Bruno is a former employee and current advisor to Marathon and Mr. Brandt.

83.     Mr. Bruno, plainly acting on behalf of Marathon and Mr. Brandt, immediately began to warn Ms. Williams against taking legal action against Marathon and Mr. Brandt.  Specifically, Mr. Bruno told Ms. Williams that if she sued, Mr. Brandt would blackball her in the industry and that she would ruin her career.

84.     On July 26, 2020, Ms. Williams spoke with Mr. Brandt.  Desperate to save her career and mindful of Mr. Bruno's threats, Ms. Williams assured Mr. Brandt that she did not want to sue and that she would walk away from Marathon for a reasonable severance.  Mr.

Brandt agreed, contingent upon Ms. Williams participating in an investigation being conducted by a third-party investigator.  Ms. Williams, of course, said that she would be more than willing to participate in any investigation into Mr. Hinckley's conduct.

85.    Mr. Brandt also told Ms. Williams that she needed to get an attorney so that it would not look like he was taking advantage of her.  However, he encouraged her to get an attorney who would simply rubberstamp any agreement reached between Marathon and Ms. Williams, rather than an attorney experienced in employment and sexual harassment law.  Mr. Brandt was, in fact, attempting to take advantage of Ms. Williams.

86.    On August 3, 2020, Ms. Williams notified Mr. Brandt that she had obtained an attorney as per his request and would be speaking with the investigator (Deborah Shapiro, Esq.) the following day:



87.    On August 4, 2020, prior to her meeting with Ms. Shapiro, Ms. Williams wrote an official statement as part of the investigation.  The statement is embedded below:

> I grew up in a small seaside town in North Carolina. Few of our graduates attend four-year colleges, and no one in my family ever has. Though my childhood was marked by financial instability, and the loss of my parents at a young age, I earned excellent grades in high school, and served America for five years in the United States Coast Guard (USCG).
>
> It was in the USCG that I met Captain Michael Day, Commander of USCG Sector New York, who was the first person in a position of power who believed in me and saw my potential. He encouraged me to apply to prestigious colleges and wrote letters of recommendation. Columbia University accepted me, and I worked very hard to earn excellent grades there.

In my senior year of college, I met Chuck Hinckley, and he soon became the second person in a position of power to believe in, encourage and advise me. I trusted Chuck due to our shared military experience, and I relished having a mentor in renewable energy and infrastructure, which became an area of interest after the civil engineering work I did for the USCG. When I met Chuck, I was working with students from my student investment fund. We were looking for investors that were interested in a 4000-hectare solar array in Vietnam. Chuck advised us on how to find investors willing to risk capital in Vietnam, a country with bankability issues and a unique political environment. I was impressed with Chuck when I realized that he ran the office of an investment bank in Manhattan that focused on energy & infrastructure, the exact space that I was interested in. I had an intellectual connection with Chuck. I admired his intelligence, his creativity, and his ability to cut through the fluff of things. I admired that he also seemed to come from a working-class background such as myself, yet he had prevailed and found financial success in New York.

When Chuck offered me a position at Marathon Capital, I felt honored, and valued. I was so proud that my hard work had paid off - a young woman from a small beach town in NC had overcome tremendous adversity to graduate with an Ivy League degree and become employed by a prestigious investment bank in New York City.

Chuck presented himself as a mentor who wanted to help me. I looked up to him and to the other highly accomplished managing directors in the New York office, and the executive team in Chicago. I was asked to draft the specific responsibilities for a new business development role, working directly for the Managing Directors and Co-Heads of Marathon's New York office. As we negotiated, the role devolved into an administrative position on paper, with lower pay than most entry-level employees right out of college. The job description had a wide scope, but did include business development, and reporting lines were complicated. I was disappointed, but Chuck strongly encouraged me to accept the role, assured me that it would be a great opportunity and that I would be professionally developed. A personal advisor told me, "If you trust Chuck to keep his word, everything should work out." From the beginning, I took my role very seriously and tried my best to help my team succeed.

Unfortunately, during my first few months, I became aware of a predatory culture at Marathon.

- Two high-level women were professionally bullied and pushed out of the firm.
- The week that the second woman was fired, Chuck Hinckley invited a young man from her previous employer to our office for a meeting, which I was asked to attend. It quickly became clear that the primary purpose for the meeting was to malign and demean this woman to an outside party - he specifically accused her of "fucking her way to the top." I now recognize that I was invited for a reason - to see how Chuck retaliated against women who confronted his misbehavior.

- On multiple occasions I was forced to read this woman's work emails and calendar events out loud to Chuck, when there was clearly no business purpose for it. This was a signal to me that Chuck was quite willing to abuse his power to exert control over everyone in the office.
- Chuck and Andrew Hinckley each accused several high-level women in the firm of having sex with their bosses to attain the positions they had earned through hard work. This denigrating commentary was a way of belittling their achievements.
- In light of the above, I began to realize that no matter how much I achieved in my role at Marathon, I inevitably would one day be on the receiving end of such allegations.
- This predatory culture at Marathon Capital disenfranchises hard-working women, blocks them from professional development and advancement opportunities, and ultimately drives them away from the firm.
- Evidence of this can be found in the fact that there is no female leadership at the firm, even though many highly qualified, natural female leaders have worked for the organization over the years.

Before long, this predatory behavior was indeed directed at me. Chuck became very controlling of me, physically and psychologically:

- He insisted I share an office with him, sitting five feet apart, even though there was ample space available throughout the office, including in the very office we sat in. The business objective of collaboration could easily have been accomplished with frequent meetings, rather than my continual presence so close to his workspace.
- I did not receive meaningful professional development.
- On multiple occasions Chuck shouted at me, "you sound like my wife," "I'm trying to get you to shut up" and "be quiet."
- When I told Chuck that I was interviewing at another firm, he said that I was going to be given a "rough ride," which is slang for sexual domination of a woman through sexual intercourse without a condom.
- Chuck regularly took credit for my work. Specifically, work that was met with approval from the rest of the management team, yet quickly deflected blame to me for anything that did not.
- He also blamed or scapegoated me for things that went wrong under his watch.
- The environment caused me so much stress that my physical health deteriorated. I had to have an MRI in May 2020 due to a stomach ulcer which was caused by acute stress from my work environment. I lost over 10lbs in 3 weeks, moving from 123 to 111lbs.

- No matter how hard I worked or how good I made Chuck look, he continued to treat me crudely, belittle me, make sexual remarks, take credit for my work, and scapegoat me.
- In sum, I did trust Chuck and accepted the role, but he did not keep his word.

I was the only woman in my office and the youngest team member by far. The situation was deteriorating and even becoming unbearable, but I needed both the money and the experience and so I did not feel comfortable speaking up. My work hours were long, and I was struggling to survive on my low salary, struggling to pay rent in Manhattan. I was promised a role in the 2020 IB Analyst class and I thought that if I tolerated the environment, then I could grow professionally and eventually leave my situation for better opportunities in the firm.

Eventually, I decided that I had no choice but to speak up, in the hope that my complaints would be taken seriously and addressed.

- Alas, as with the many complaints from multiple employees over the course of years about Chuck's inappropriate behavior, Chuck was protected by Executive Management.
- On the evening of April 29, 2020, I sent a letter to Executive Management asking that Chuck be removed from the regional management role and that my role have a more clearly defined scope.
- Executive Management never responded to my letter. This emboldened Chuck even more; he was the only member of the executive team to "address the letter" with me.
- Chuck made it clear to me that there was nothing he could do that would lead to his being fired. He retaliated against me and tried to force me out.
- Specifically, Chuck told me words to the effect that, "People here just do not like you. I am not sure why, but they do not view you as capable, and they are never going to train you or pay you what you want. I am going to find you a new job where you can make a more substantial amount of money. The first people I worked for were idiots too."
- In reality, it was not my actions, but Chuck's actions---his inappropriate behavior and the negative, toxic, divisive effect that he had on our team and on the company that caused his leadership to be questioned, yet he blamed me.
- Chuck told me I should go to work for InfraRed Infrastructure because "the guy who runs that group is an idiot and the women who work for him are going to get him fired." He said that "If I wanted to get my boss fired then InfraRed would be a good place for me."
- I was confused as to why he was trying to discourage me or bully me into quitting when I had been doing most of his work for the last six months.

29

- When I contacted the other Co-Head, Gary Greenblatt, to speak about why I was being encouraged to leave when I had been excelling in my role, he said that he had not spoken to Chuck nor had any knowledge of his plans to suggest that I look for opportunities outside of Marathon.
- When I spoke to Ted and other members of executive management about what I was experiencing in my office, they told me that although they sympathized with me, they needed Chuck's skillset and revenue generating ability, and that there was nothing that they could do except help me find a new job.
- Marathon clearly valued Chuck's revenue-earning ability over the mental and physical well-being of its employees, particularly its female employees.
- Management's sole response to Chuck's behavior was to attempt to rein in the spending of the NY Office by suspending employee credit cards. Neither management nor Chuck ever notified me that my Firm credit card had been suspended.
- Thus, at the height of the pandemic in NYC, I endured the fear and humiliation of standing in a crowded express mail office in Midtown, trying to ship office equipment to my superiors, only to be told that my Firm credit card had been declined - so I had to use my own card, at a time when I had barely the balance necessary to cover my rent.
- This was but one more example of the manner in which I was utterly betrayed by Chuck and the Firm.
- Management's repeated and shocking failure to address the problem led Chuck to believe that his egregious, controlling and sexist behavior was beyond reproach. This led directly to the incident that occurred on Thursday, July 23.
- I telephoned Chuck around noon, and spoke to him when he called me back at 1:15pm EST, to tell him that I was coming into the office in a few hours to get some personal items, and to speak about my job search.
- When I entered the office, I went to the conference room and encountered Chuck with his pants undone and engaged in a sexual act. - even though I called him a few hours before to tell him I was coming into the office late afternoon.
- Chuck's initial reaction was not even to fully zip up his pants - but rather to close the Web browser he had been viewing.
- This was premeditated, aggressive and hostile behavior that scared me and made me feel extremely uncomfortable.
- Despite the outrageous circumstances, Chuck did not apologize to me or acknowledge my distress at walking in on him masturbating in the conference room with the door open.
- No, Chuck instead insisted that I sit side-by-side with him for over an hour to discuss work material.

- This was the most uncomfortable hour of my professional life.

*****

88.     Mr. Brandt immediately followed with a threatening message in a blatant attempt to silence Ms. Williams:



89.     The claim that copying Mr. Grant (who had nothing to do with the masturbation incident) and Ms. Rogers (who already knew about it) could possibly undercut the integrity of the investigation was a complete farce.  Mr. Brandt simply did not want Ms. Williams to further discuss or disclose the sexual misconduct and discriminatory bias that permeates Marathon.

90.     Given that Mr. Brandt had threatened her, Ms. Williams, in a panic, sent him various texts asking him whether he was reneging on his agreement to provide her with reasonable severance.  Other than to (falsely) state that there was no agreement, Mr. Brandt failed to respond.

91.     Over the course of the following three weeks, Ms. Williams found herself increasingly isolated.  By August 20, 2020, clearly at the direction of Mr. Brandt and the leadership at Marathon, all Marathon employees ceased to respond to any of Ms. Williams' texts or emails.

92.     During this time, Ms. Williams engaged in additional protected activity, including, *inter alia*, the following texts to Mr. Brandt:



93.     Mr. Brandt failed to respond to these messages.

94.     There is no question that, during this time, Ms. Williams sent messages that she wished she could have back – she was devastated, frustrated, alone and had been threatened by Mr. Brandt and that does not even account for everything she experienced working at Marathon – however, at no time did Ms. Williams engage in any terminable offenses.

95.     On Saturday, August 22, 2020, at 2:48 p.m., Ms. Williams sent Mr. Brandt additional text messages in which she raised concerns about the integrity of his financial dealings, as well as reiterating her complaints about Mr. Hinckley, including about the masturbation incident.

96.     Within mere minutes, Ms. Williams received a call from a blocked phone number:

| 08/22/2020 | 02:50 PM | INCOMING | 999-999-9999 | Peak | 1 minutes |

97.     The individual on the other end of the line claimed to be a New York City police officer.  This individual, who was obviously acting at the direction of Mr. Brandt, threatened Ms.

Williams.  Specifically, he claimed that Ms. Williams was texting a number that was not Mr.

Brandt's (untrue) and then stated "I am an NYPD police officer. If you speak about what is going

on at Marathon, about Ted, or communicate with Ted any further then something very bad will

happen to you."  He then hung up.

98.     Ms. Williams immediately reported this call to literally every employee at

Marathon.  In response, Ms. Williams was retaliatorily cut off Marathon's email, remote access

systems and blocked from logging into her computer.  The stated reason for this decision was

that Ms. Williams had sent "inappropriate, harassing, and disparaging text messages to multiple

Marathon employees."  Put another way, Marathon admitted – in writing – that it had suspended

Ms. Williams' access to Marathon's systems because she engaged in protected activity.

99.     Two days later, Ms. Williams was fired for the same reason.  The termination

meeting, attended by Mr. Lavertu and the third-party Human Resources consultant, was

recorded.  During the termination meeting, Ms. Williams repeatedly stated that she was being

terminated in retaliation for reporting sexual harassment:

- "I feel that this is retaliation for reporting sexual harassment."

- "My work environment is hostile and Chuck was masturbating in the office."

- "People are calling me, and threatening me, in-personating policers and I'm concerned for my safety. They told me that if I tell anyone about what's going on at Marathon or contact Ted, or speak to anyone about this then something really bad will happen to me."

100.    Neither Mr. Lavertu nor the third-party Human Resources consultant denied any

of these statements.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Gender Discrimination in Violation of the NYSHRL)
#### *Against All Defendants*

101.    Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

102.    Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by subjecting Plaintiff to disparate treatment based upon her gender, including, *inter alia*, discriminatory pay, termination and/or a hostile work environment.  Mr. Hinckley, Mr. Brandt and Mr. Lavertu aided and abetted the unlawful discrimination.

103.    As a direct and proximate result of Defendants' unlawful discriminatory conduct and aiding and abetting of same in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

104.    As a direct and proximate result of Defendants' unlawful discriminatory conduct and aiding and abetting of same in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

105.    Defendants' unlawful discriminatory conduct and aiding and abetting of same were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
### *Against All Defendants*

106.    Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

107.    Defendants have retaliated against Plaintiff on the basis of her protected activity in violation of the NYSHRL by subjecting Plaintiff to adverse actions because she engaged in protected activity, including, *inter alia*, termination.  Mr. Hinckley, Mr. Brandt and Mr. Lavertu aided and abetted the unlawful retaliation.

108.    As a direct and proximate result of Defendants' unlawful retaliatory conduct and aiding and abetting of same in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

109.    As a direct and proximate result of Defendants' unlawful retaliatory conduct and aiding and abetting of same in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

110.    Defendants' unlawful retaliatory conduct and aiding and abetting of same were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Gender Discrimination in Violation of the NYCHRL)
### *Against All Defendants*

111.    Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

112.    Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by subjecting Plaintiff to disparate treatment based upon her gender, including, *inter alia*, discriminatory pay, failures to promote, termination and/or a hostile work environment.  Mr. Hinckley, Mr. Brandt and Mr. Lavertu aided and abetted the unlawful discrimination.

113.    As a direct and proximate result of Defendants' unlawful discriminatory conduct and aiding and abetting of same in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

114.    As a direct and proximate result of Defendants' unlawful discriminatory conduct and aiding and abetting of same in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

115.    Defendants' unlawful discriminatory conduct and aiding and abetting of same were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
### *Against All Defendants*

116.     Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

117.     Defendants have retaliated against Plaintiff on the basis of her protected activity in violation of the NYCHRL by subjecting Plaintiff to adverse actions because she engaged in protected activity, including, *inter alia*, failures to promote and/or termination.  Mr. Hinckley, Mr. Brandt and Mr. Lavertu aided and abetted the unlawful retaliation.

118.     As a direct and proximate result of Defendants' unlawful retaliatory conduct and aiding and abetting of same in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

119.     As a direct and proximate result of Defendants' unlawful retaliatory conduct and aiding and abetting of same in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

120.     Defendants' unlawful retaliatory conduct and aiding and abetting of same were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.      A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the State of New York and the City of New York;

B.      An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.      An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, seniority, and other benefits of employment;

D.      An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her emotional distress;

E.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff, including, but not limited to, loss of income, earned bonus pay, reputational harm and harm to professional reputation, in an amount to be determined at trial;

F.      An award of punitive damages and any applicable penalties and/or liquidated damages, in an amount to be determined at trial;

G.      Reinstatement;

H.      Prejudgment interest on all amounts due;

I.      An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and,

J.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated:  September 22, 2020
     New York, New York                 Respectfully submitted,

**WIGDOR LLP**

By: _____
         Michael J. Willemin
         Sarah J. Arena

85 Fifth Avenue
New York, NY 10003
Telephone:  (212) 257-6800
Facsimile:  (212) 257-6845
mwillemin@wigdorlaw.com
sarena@wigdorlaw.com

*Attorneys for Plaintiff*

39